DAVIS, Circuit Judge,
dissenting:
There is much in the majority’s thoughtful and thorough opinion with which I agree. Alas, however, “I feel constrained by a sense of duty to express my nonconcurrence in the action of the court in this present case.” Twining v. New Jersey, 211 U.S. 78, 114, 29 S.Ct. 14, 53 L.Ed. 97 (1908) (Harlan, J., dissenting). I part company from the majority on two issues: (1) its application of the plain view exception to justify the seizure of the bag containing Davis’s clothing from the hospital and the subsequent search of that bag and (2) its refusal to apply the exclusionary rule.[1] I conclude for the reasons explained herein that the seizure of the bag was unlawful and, even assuming the seizure could somehow be justified, the subsequent search of the bag effected a distinct violation of Davis’s constitutionally protected privacy interests. Furthermore, I conclude that the majority’s creation of a freestanding, ad hoc exception to the exclusionary rule is unwise and unsupported by the facts of this case, extant Supreme Court precedents, or our own precedents. Thus, I would vacate the judgment, reverse the denial of Davis’s motion to suppress, and remand this case for further proceedings, as appropriate.[2]
*259 I.
A.
On August 29, 2000, Davis was treated at Howard County (Maryland) General Hospital for a gunshot wound to his right thigh. Davis told hospital staff that he had been shot in the course of a robbery. As required by state law, hospital personnel notified the Howard County Police Department (“HCPD”) that it was treating a gunshot victim. See Md.Code Ann., Health-Gen. § 20-703. Detective Joseph King of the HCPD, then a uniformed patrol officer, was the first to respond to the hospital; King spoke with Davis concerning the circumstances of the shooting. Detective King testified at the suppression hearing that the hospital had been on his beat for approximately two years, and that he had responded on previous occasions to individuals with gunshot wounds. When he arrived at the hospital, he located Davis in the emergency room on a bed or gurney. According to Detective King, Davis presented him with a District of Columbia driver’s license that showed his photograph and the name “Gary Edmonds.”
Detective King observed Davis’s gunshot wound. He then seized a bag containing Davis’s pants and boxer shorts, which had been removed by hospital personnel, placed in the bag, and stored on a shelf beneath the bed. Detective King testified that he considered the clothing to be evidence of the crime reported, i.e., Davis’s shooting. Detective King did not receive assistance from hospital personnel in retrieving the bag, which he testified was similar to other occasions on which he had responded to the hospital to' investigate shootings. Detective King did not seek or obtain Davis’s consent to take the bag or otherwise discuss the matter with Davis. He assumed Davis was aware that he was taking the bag because Davis observed him take possession of-it. Detective King described Davis’s attitude towards questioning as “uncooperative.” J.A. 143.
A short time later, Lieutenant Steven Lampe appeared at the hospital. Lieutenant Lampe took the bag from Detective King and later submitted it to the HCPD property room to be held as evidence. Lieutenant Lampe testified that the clothing was in a plastic bag when he took it from Detective King, but he could not recall what the bag looked like. Lieutenant ' Lampe did not inspect the clothing right away. Consistent with Detective King’s testimony, he stated that Davis was not forthcoming in response to questioning, gave only vague information about the shooting, and was not interested in reporting the crime. After speaking with Davis, the police attempted to confirm his identity through various computer inquiries and found no history of a “Gary Edmonds.”
Because the officers believed that Davis was being untruthful in his report of how he- was shot; in part due to his lack of cooperation, the officers located the vehicle in which Davis’s friend had driven him to the hospital, observed what appeared to be blood on the front passenger- seat, and requested a K-9 officer to have his dog scan the car. The dog positively' alerted to the presence of a controlled dangerous substance (“CDS”), and the car was searched. The police recovered a small amount of marijuana in the vehicle and accordingly arrested Davis and took him into custody upon his release from the hospital later that day. Lieutenant Lampe testified that the hospital staff had given Davis something to wear, Davis’s clothing having been seized by Detective King. The police subsequently identified Davis by his fingerprints as “Earl Davis,” and he admitted his true identity. Davis was charged with possession of marijuana and posses *260 sion of CDS paraphernalia, but the charges were later dismissed.
The investigation into Davis’s shooting concluded without an arrest, and the case was considered closed as of November 7, 2000. To that point, no forensic testing had been conducted on the bloody clothing seized from Davis at the hospital. Davis was not contacted or otherwise advised that the shooting investigation was closed.
Several months later, in June 2001, an individual named Michael Neal was murdered in nearby Prince George’s County, Maryland. At some point in the ensuing three years detectives in the Prince George’s County Police Department (“PGCPD”) came to suspect Davis of having committed the murder. In the course of investigating the Neal murder, in April 2004 members of the PGCPD contacted Lieutenant Lampe to inquire about Davis’s arrest at Howard County General Hospital in 2000. The PGCPD officers specifically asked whether any property had been seized from Davis that might contain his DNA. Lieutenant Lampe understood from this inquiry that Davis was now a suspect in a homicide. Later that month, two PGCPD homicide detectives who were familiar with the facts of the Neal murder went to the HCPD to pick up Davis’s clothing for the purpose of DNA testing. Lieutenant Lampe delivered the clothing to the PGCPD detectives on April 29, 2004. On the property form for the clothing, Davis was clearly identified as a “victim.” J.A. 164. Davis was not notified that the PGCPD had obtained his clothing. The PGCPD detectives submitted Davis’s clothing to their DNA lab in connection with their investigation of the Neal murder.
Shortly thereafter, in or around June 2004, Davis’s DNA was extracted from the blood stains on his boxer shorts, his profile was created, and the profile was compared to an unknown DNA profile derived from evidence obtained at the scene of the Neal homicide. The profiles did not match, and Davis was therefore excluded as the source of the evidentiary sample from the Neal murder. Davis’s DNA profile was then entered into the local Prince George’s County Combined DNA Index System (“CODIS”) database. His DNA profile was never expunged or otherwise removed from the database.
B.
On August 6, 2004, shortly before 1:00 p.m., Jason Schwindler, an armored car employee, picked up a bank deposit from a local business and took it to a nearby BB & T bank in Hyattsville, Maryland, located in Prince George’s County. As Schwindler walked up to the bank entrance, two gunmen exited a Jeep Cherokee and shot Schwindler, killing him. When their escape in the Jeep was thwarted by the armored truck driver, the assailants carjacked a bank customer and fled in her Pontiac Grand Am. The carjacked vehicle was later recovered.
After Schwindler’s murder, officers from the PGCPD responded to the crime scene and collected evidence. Numerous items were recovered, including a baseball cap worn by one of the shooters, two firearms, and steering wheel covers from the Jeep Cherokee and the Pontiac Grand Am, the vehicles the shooters had driven to and away from the crime scene, respectively. These items were swabbed and analyzed for DNA. The DNA profiles of the major contributor to the DNA found in the ball-cap and on the trigger and grip of the recovered firearms were entered into the Prince George’s County CODIS database. As a result of a search of the local database, on or about August 14, 2004, there was a “cold hit” between the DNA profile derived from material found on the base *261 ball cap recovered at the crime scene and Davis’s DNA profile in the database.
Law enforcement officers were notified of the match and, based on the cold hit, they promptly sought, and a state judge issued, warrants authorizing them to obtain DNA from Davis and to search the home of his girlfriend, Dana Holmes. Pursuant to the search warrant, a DNA sample was taken from Davis and his DNA profile was compared to the profiles derived from the DNA deposited on items recovered from the crime scene. The DNA analyst concluded that, to a reasonable degree of scientific certainty, Davis was the source of the DNA recovered from three pieces of evidence related to the Schwindler murder: (1) the steering wheel cover of the stolen Jeep Cherokee the assailants drove to the bank; (2) a baseball cap dropped by one of the assailants during the course of the robbery; and (3) the steering wheel cover of the Pontiac Grand Am in which the assailants fled the scene.
C.
On March 31, 2008, a federal grand jury returned a superseding indictment charging Davis with one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1959; two counts of possession and discharge of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); one count of possession and discharge of a firearm resulting in death (murder), in violation of 18 U.S.C. § 924(j); one count of carjacking, in violation of .18 U.S.C. § 2119; and one count of felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Davis pleaded not guilty and proceeded to trial.
Prior to trial, Davis moved to suppress all direct and derivative evidence obtained from the warrantless seizure of his clothing at Howard County General Hospital, including his DNA profile. The district court denied Davis’s motion to suppress after holding an evidentiary hearing and, following the conclusion of trial, filed a thoughtful opinion accepting some of Davises arguments and rejecting others, but ultimately reaffirming its earlier denial of the motion to suppress. United States v. Davis, 657 F.Supp.2d 630 (D.Md.2009).
The DNA evidencé presented at trial consisted of the PGCPD analyst’s finding that Davis’s DNA profile matched the DNA profile' derived from the evidence recovered from the scene of the Schwindler murder to a reasonable degree of scientific certainty. Davis challenged the validity of the analyst’s findings. In particular, he questioned whether the amount of DNA recovered from the crime scene was sufficient to produce accurate results and whether the government’s "statistical probability calculations (i.e., the statistics supporting the conclusion that Davis was the source of the DNA on each of the three items recovered from the crime scene) were reliable and accurate.
Davis’s trial began on May 5, 2009, and lasted approximately five weeks. At the conclusion of the trial on June 3, 2009, the jury returned a guilty verdict on all counts. The district court sentenced Davis to' a term of life imprisonment plus 420 months. Davis timely appealed the district court’s denial of his motion to suppress and grant of the government’s motion to exclude expert testimony.
II.
As the majority explains, Davis argues the district court committed reversible error in denying his motion to suppress DNA evidence. He contends that the following separate Fourth Amendment violations led to the “cold hit” match that implicated him in the Schwindler murder.[3] *262 First, Davis argues that the initial nonconsensual, warrantless seizure of the bag of clothing from Howard County General Hospital by the HCPD in 2000 violated his Fourth Amendment rights. Second, he contends that the related, subsequent non-consensual, warrantless search of the bag was unlawful, rendering all further uses of the evidence derived therefrom inadmissible as “fruit of the poisonous tree.” Third, he asserts that PGCPD officials violated the Fourth Amendment when they extracted and chemically analyzed a sample of his DNA from the clothing without consent or a warrant in 2004. Fourth, Davis contends that the nonconsensual, warrantless uploading and retention of his DNA profile in the local CODIS database constituted yet a further Fourth Amendment violation. Of these four alleged violations, the district court found that only the retention of Davis’s DNA profile in the CODIS database constituted a Fourth Amendment violation, although it ultimately concluded that applying the exclusionary rule was not appropriate on the basis of the good-faith exception.
The majority agrees with the district court’s analysis in significant part. In particular, the majority agrees that the warrantless seizure of the bag containing Davis’s clothing, as well as the subsequent, distinct search of the bag, and the subsequent seizure of the contents of that bag, resulting in the extraction of Davis’s biological material, all may be justified on the basis of the plain view seizure exception to the warrant clause of the Fourth Amendment. I respectfully dissent from that extraordinary holding. The plain view exception does not apply under the circumstances in this case. Furthermore, even if it could be applied in some plausibly recognizable manner, the plain view seizure doctrine could not possibly justify the separate search of the bag containing Davis’s clothing. Accordingly, the majority’s substantive Fourth Amendment analysis is fatally flawed, quite apart from its unwarranted refusal to apply the exclusionary rule.
A.
As the district court correctly observed, Davis, 657 F.Supp.2d at 636, the government bears the burden of proving, by a preponderance, the legality of the search and seizure of evidence obtained without a warrant (or evidence derived therefrom) which it intends to introduce at trial. See Welsh v. Wisconsin, 466 U.S. 740, 749-50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) (exigent circumstances); United States v. Mendenhall, 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (consent); United States v. Matlock, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974) (same); cf. Illinois v. McArthur, 531 U.S. 326, 338, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) (Souter, J., concurring) (“[M]ost states follow the rule which is utilized in the federal courts: if the search or seizure was pursuant to a warrant, the *263 defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution.”) (quoting 5 W. LaFave, Search and Seizure § 11.2(b), p. 38 (3d ed.1996)). In assessing a trial court’s ruling on a motion to suppress, we review factual findings for clear error and legal determinations, including “determination[s] of whether the historical facts satisfy a constitutional standard,” de novo. United States v. Gwinn, 219 F.3d 326, 331 (4th Cir.2000); see also Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); United States v. Wilson, 484 F.3d 267, 280 (4th Cir.2007). When a motion to suppress has been denied in the court below, we review the evidence in the light most favorable to the government. United States v. Seidman, 156 F.3d 542, 547 (4th Cir.1998),
B.
The HCPD’s original nonconsensual, warrantless procurement of Davis’s bloody boxer shorts and pants in 2000 requires that we decide whether the district court erred in its legal conclusion that Detective King was entitled to both seize the bag containing the clothing and to search its contents without consent and in the absence of a judicial warrant. Echoing the district court’s analysis, the majority concludes that Detective King was justified in seizing the bag because he had “lawful access” to it and because it was “immediately apparent” to him, and would have been so to any reasonable officer in his position, that the bag contained Davis’s pants and that the pants contained a bullet hole, i.e., evidence of a crime. Maj. Op. at 235-37. The majority further elaborates its unique reconception of the longstanding plain view seizure doctrine by concluding that King was justified in searching the bag’s contents, without obtaining Davis’s consent or a warrant, because it was a “foregone conclusion” that the bag contained evidence of a crime. Maj. Op. at 235, 236-37 (relying upon Williams, 41 F.3d 192).
The majority’s analysis is deeply flawed. As I explain in subsection II.B.l, application of rudimentary and long-established Fourth Amendment principles demonstrates that Detective King’s seizure of the bag from Davis’s possession violated Davis’s Fourth Amendment right to be free of an unreasonable seizure of his personal “effects” and cannot be shoehorned into a plain view seizure analysis. Furthermore, as I show more specifically in subsections II.B.2 and II.B.3, long-settled understandings of the plain view seizure doctrine demonstrate that under no reasonable interpretation of the facts found by the district court can it be said that the nonconsensual, warrantless search of the bag was justified under that doctrine. As I demonstrate, neither Williams, nor any other precedent cited to us by the government supports, let alone compels, the remarkable application of the plain view seizure doctrine engaged in by the majority.
1.
It is common ground among the panel that a well-established exception to the Fourth Amendment’s warrant requirement provides that a law enforcement officer may seize evidence in “plain view” without a warrant where (1) the officer is lawfully located in a place from which the item can plainly be seen; (2) the officer has a lawful right of access to the item itself; and (3) the incriminating nature of the seized item is immediately apparent. See Horton v. California, 496 U.S. 128, 136-37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). As this test makes clear, the intrusions implicated by the first two prongs of the test must be lawful. In other words, in both viewing the item to be seized and in actually taking *264 physical possession of it, police must not infringe constitutionally protected privacy or possessory interests in the absence of a warrant or other well-recognized exception to the warrant requirement. See Texas v. Brown, 460 U.S. 730, 738-39, 103 S.Ct. 1535, 75 L.Ed.2d 502 (opining that “plain view” should not be considered an independent exception to the warrant requirement, but rather an extension of a prior justification for an officer’s “access to an object”) (plurality opinion); see also Horton, 496 U.S. at 137 n. 7, 110 S.Ct. 2301 (explaining that the lawful right of access requirement is “simply a corollary of the familiar principle ... that no amount of probable cause can justify a warrantless search or seizure absent ‘exigent circumstances’ ”) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 468, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (plurality opinion)).
In addition, the item’s incriminating nature must be “immediately apparent” at the time the police view it, meaning that there is a “practical, nontechnical probability that incriminating evidence is involved.” Brown, 460 U.S. at 742, 103 S.Ct. 1535 (internal quotation marks omitted); see also Minnesota v. Dickerson, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (“If ... the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object — i.e., if its incriminating character is not immediately apparent, Horton, 496 U.S. at 136, 110 S.Ct. 2301 — the plain-view doctrine cannot justify its seizure.”) (internal quotation marks and brackets omitted); Soldal v. Cook County, Illinois, 506 U.S. 56, 66, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (explaining that “ ‘plain view’ seizures ... can be justified only if they meet the probable-cause standard”).
The government has failed to meet its burden here to establish that the seizure of the bag containing Davis’s clothing can be justified by application of the plain view seizure doctrine, and the subsequent search of the bag could never be justified by the plain view seizure doctrine in any event, no matter how much evidence the government could muster.
There is no dispute that Detective King was lawfully present in the emergency room where Davis was being treated, and thus viewed the bag from a lawful vantage point. There is a constitutionally cognizable distinction, however, between the emergency room generally and the more narrowly delineated area beneath Davis’s bed where the bag had been stored. Thus, the majority fails (or simply refuses) to recognize that although this case does not involve the paradigmatic factual scenario in which police view an item through a window before entering a premises to retrieve it, see Maj. Op. at 233-34, the lawful vantage point and lawful access prongs do not necessarily rise and fall together. Rather, there are distinct possessory and privacy interests implicated by the facts before us, namely the specific location of the bag and the fact that it contained non-contraband personalty or, to use the constitutional parlance, Davis’s constitutionally protected “effects.”
As a matter of law, Davis never relinquished his possessory rights in his effects prior to their seizure. See United States v. Neely, 345 F.3d 366, 369 & n. 4 (5th Cir.2003) (“[A]n emergency room patient does not forfeit his possessory rights to clothing simply by walking (or in many cases being carried) through the hospital door.”) (collecting cases). Howard County General Hospital personnel ensured that Davis’s clothing was in his immediate personal possession and control when they placed it in a bag on the shelf directly *265 beneath his bed. See People v. Yaniak, 190 Misc.2d 84, 738 N.Y.S.2d 492, 495-96 (N.Y.Co.Ct.2001) (“[T]he placing of the garments in the green plastic bag by hospital personnel evinced an objective belief that the items were still the personal property of the defendant and that, when he felt better, they would be returned to him”).
Of course, Davis would have retained his possessory interest in the clothing (and thus the bag containing the clothing), as well as his residual privacy interest in his clothing,[4] even if the hospital had safeguarded it in some other location. See Neely, 345 F.3d at 370 (explaining that once clothing is taken from the patient and secured by hospital employees, the hospital becomes a bailee and employees have no authority to permit police to retrieve the clothing without a warrant) (citation omitted). In addition, there is no evidence that Davis abandoned his clothing or that he consented to the seizure. Accordingly, under the circumstances, the police no more had “lawful access” to the bag containing Davis’s clothing as he lay in the hospital receiving treatment than they would have had if the bag had been locked in a cabinet for patients’ belongings or, indeed, held in Davis’s hands while he was being treated.[5]
Manifestly, an officer’s physical access to a citizen’s non-contraband personalty in the possession of the citizen is not equivalent to an officer’s “lawful access” to that personalty under the plain view doctrine. In other words, the mere existence of *266 probable cause to believe a container in the possession of a citizen holds evidence of criminal activity, where the evidence is not contraband, is not alone sufficient to effect a warrantless seizure of that container from the possession of the citizen.[6]
As Davis correctly argues, and as the district court acknowledged, “A warrant-less seizure is ‘per se unreasonable under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions’ to the warrant requirement. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (footnotes omitted); Flippo v. West Virginia, 528 U.S. 11, 13-14, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999) (same).” Appellant’s Br. at 21; see Davis, 657 F.Supp.2d at 636. The plain view seizure doctrine does not supplant the need for such an exception where an officer intrudes upon constitutionally protected privacy or possessory interests in physically retrieving the item to be seized from the person of its owner. See Horton, 496 U.S. at 137, 110 S.Ct. 2301 (“[N]ot only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.”); Jones v. State, 648 So.2d 669, 678 (Fla.1994) (explaining that the lawful access requirement “ensures that the scope of the intrusion into Fourth Amendment rights is no greater than that already authorized in connection with the lawful entry”); see also infra pp. 275-76 (explaining why seizures of containers holding “mere evidence” are distinguishable from containers holding contraband). Accordingly, in the absence of a recognized justification (e.g., exigent circumstances, which the district court did not find applicable) for intrusion upon Davis’s protected interests, Detective King could not lawfully seize the bag under the plain view seizure doctrine from Davis’s possession without a warrant or consent, irrespective of whether it was “immediately apparent” that the clothing suspected of being contained *267 therein constituted. evidence of a crime.[7] As the government accurately describes the relevant circumstances, “the [bag containing the] clothing was readily accessible to Detective King,” Govt’s Br. at 33-34, but that most assuredly does not mean that Detective King had “lawful access” to the bag or the clothing contained therein under the plain view seizure doctrine.
2.
Of course, even if Detective King could conceivably, on some theory, lawfully seize the bag, that does not mean that he could inspect its contents,- i.e., search the bag, without obtaining Davis’s consent or a judicial warrant.[8] “Even when government agents may lawfully seize such a package to prevent loss or destruction of suspected contraband [or mere evidence], the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package,” United States v. Jacobsen, 466 U.S. 109, 114, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984) (brackets added), or otherwise satisfy one of the exceptions to the warrant requirement. Horton, 496 U.S. at 141 n. 11, 110 S.Ct. 2301. In other words, as Judge Niemeyer (who, three,years ear *268 lier, had been a member of the panel in Williams) has cogently explained, “The ‘plain-view’ doctrine provides an exception to the warrant requirement for the seizure of property, but it does not provide an exception for a search.” United States v. Jackson, 131 F.3d 1105, 1108 (4th Cir. 1997) (emphasis in original); accord United States v. Rumley, 588 F.3d 202, 205 (4th Cir.2009).
Only in a very limited subset of cases involving “closed, opaque container[s]” may an officer open the container without first obtaining a warrant or the owner’s consent, Robbins v. California, 453 U.S. 420, 426, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981) (plurality opinion), at least where, as here, the container is not located in a vehicle. One exception to the search warrant requirement in this context is in cases involving exigency. See Chadwick, 433 U.S. at 15 n. 9, 97 S.Ct. 2476 (“Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon.”).[9] Another exception, the one the district court and the majority erroneously rely on, is for “containers (for example a kit of burglar tools or a gun case) [that] by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.” Sanders, 442 U.S. at 764 n. 13, 99 S.Ct. 2586. In those cases, because “the distinctive configuration of [the] container proclaims its contents,” the owner of the container has no reasonable expectation of privacy in those contents, Robbins, 453 U.S. at 427, 101 S.Ct. 2841 (plurality opinion) — and thus an officer’s observation of those contents does not constitute a separate “search” for Fourth Amendment purposes. See Illinois v. Andreas, 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983) (“If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no ‘search’.... ”). In such cases the shape and/or character of the container, including where relevant its labeling, even if closed and opaque, is constitutionally equivalent to one that is open or transparent, because it “clearly reveal[s] its contents.” Id.; see also Arizona v. Hicks, 480 U.S. 321, 328, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (“[A] truly cursory inspection — one that involves merely looking at what is already exposed to view, without disturbing it — is not a ‘search’ for Fourth Amendment purposes, and therefore does not even require reasonable suspicion.”); United States v. Payne, 181 F.3d 781, 787 n. 4 (6th Cir. 1999) (“There is no such thing as a ‘plain-view search.’ ”).[10]
*269 We have carefully limited the scope of this “proclaims its contents” exception to cases where the incriminating nature of the contents is a “foregone conclusion.” See Williams, 41 F.3d at 192; see also Sanders, 442 U.S. at 764 n. 13, 99 S.Ct. 2586 (requiring that the container’s owner not maintain “any reasonable expectation of privacy” in the contents) (emphasis added).[11] Indeed in United States v. Corral, 970 F.2d 719 (10th Cir.1992), on which Williams principally relied, the court found that no search occurred only because there was a “virtual certainty” that the package contained, in that case, cocaine. Id. at 726 (quoting Brown, 460 U.S. at 751 n. 5, 103 S.Ct. 1535 (Stevens, J., concurring in the judgment)). The obviousness of a container’s contents must be such that an officer’s view of the container is “equivalent to the plain view” of the incriminating contents themselves. Id. (emphasis added).[12] The analogy we used *270 in Williams illustrates both the centrality to the plain view seizure doctrine of the character of the container and the high degree of certainty required: “[W]hen a person opens a Hershey bar, it is a foregone conclusion that there is chocolate inside.” 41 F.3d at 198; see also Brown, 460 U.S. at 750-51, 103 S.Ct. 1535 (Stevens, J., concurring in the judgment) (concurring in the application of the exception because the container there — a knotted party balloon located in a car close to several small plastic vials, quantities of loose white powder, and an open bag of party balloons— was “one of those rare single-purpose containers which ‘by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance’ ”). Only if the character of a closed, opaque container proclaims its incriminating contents to such a degree do we excuse officers from obtaining a search warrant to open the container, assuming the officer has lawfully come into possession of the container.[13]
The above principles reflect the longstanding interplay between the two separate interests at stake: citizens’ interest in retaining possession of their property and their interest in maintaining personal privacy. These two interests roughly correspond to seizures and searches, respectively, as “[a] seizure threatens the former, a search the latter.” Brown, 460 U.S. at 747, 103 S.Ct. 1535 (Stevens, J., concurring in the judgment). This distinction, in turn, informs the plain view seizure doctrine in this context. As Justice Stevens has explained,
As a matter of timing, a seizure is usually preceded by a search, but when a container is involved the converse is often true. Significantly, the two protected interests are not always present to the same extent; for example, the seizure of a locked suitcase does not necessarily compromise the secrecy of its contents, and the search of a stopped vehicle does not necessarily deprive its owner of possession.
Id. at 747-48, 103 S.Ct. 1535.
Apart from the special concerns arising from seizures of containers, we allow police officers to seize incriminating objects in *271 plain view with a showing only of probable cause because the seizure “threatens only the interest in possession;” such objects “can be seized without compromising any interest in privacy.” Id. at 748, 103 S.Ct. 1535. “[I]f an officer has probable cause to believe that a publicly situated item is associated with criminal activity” the owner’s interest in possession is “diminish[ed],” and becomes “outweighed by the risk that such an item might disappear or be put to its intended use before a warrant could be obtained,” and the object may be seized without a warrant. Id. (citing G.M. Leasing Corp. v. United States, 429 U.S. 338, 354, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977); Payton v. New York, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)).
Where there is a “link” between the seizure and “a prior or subsequent search,” however, there is a “danger ... that officers will enlarge a specific authorization, furnished by a warrant or an exigency, into the equivalent of a general warrant to rummage and seize at will.” Id. Averting that danger requires not only that the officer have probable cause to connect the item with criminal behavior, but also that the seizure “entail[s] no significant additional invasion of privacy.” Id. This danger is particularly acute where, as here, “an officer comes upon a container in plain view and wants both to seize it and to examine its contents.” Id. at 749, 103 S.Ct. 1535. The Court has “emphasiz[ed] the Fourth Amendment privacy values implicated whenever a container is opened.” Id.
3.
In light of these controlling principles, the dispositive issues bearing on the applicability of the plain view seizure doctrine before the district court were fairly straightforward. Given the above concerns, the issues can be easily framed: Could the government justify Detective King’s nonconsensual, warrantless seizure of the bag, a closed, opaque container, on the one hand? Belatedly (but distinctly), did. King’s immediate opening of such a container constitute a “non-search” (because it does not invade its owner’s reasonable expectation of privacy) or, instead, an impermissible warrantless search, on the other hand? Although the district court and the majority of the panel conclude that our Williams precedent provides easy answers to those questions, upon a close view of the facts in Williams and in light the precedents discussed above, it is clear that the majority’s reliance on that case is wholly misplaced.
In Williams, an airline employee conducted a private search of the defendant’s luggage and found several cellophane-wrapped packages that, according to her, “looked like dope.” 41 F.3d at 198. She alerted police officers, who seized the packages and then removed some of the content, conducting a chemical field test that revealed that the packages contained cocaine. Id. at 194. The seizure was proper under the plain view doctrine, we concluded, because not only did the officers have lawful access to the packages; there was “no doubt” of the packages’ “incriminating nature”: “the packages were wrapped in heavy cellophane with a brown opaque material inside, and were found with towels, dirty blankets and a shirt in an otherwise empty suitcase.” Id. at 196-97. In fact, the seizing officer later testified that “in his ten years of experience such packages always contained narcotics.” Id. at 197 (emphasis added).
We then turned to whether the police needed a warrant to remove any of the contents of the packages. To justify the warrantless search, we explained, the government must not only show there was probable cause the container contained evi *272 dence of a crime, but rather that, based on characteristics of the container itself and “the circumstances under which an officer [found] the container,” the contents’ incriminating nature was “a foregone conclusion.” Id. at 197 (citing Blair, 665 F.2d at 507). We concluded that “the incriminating nature of the five packages found in Williams’ suitcase was a foregone conclusion,” given
(1) the manner in which the cocaine was packaged (apparently weighing approximately one kilogram each, heavily wrapped in cellophane with a brown opaque material inside); (2) Detective Finkel’s firm belief, based on his ten years’ experience, that packages appearing in this manner always contained narcotics; (8) [the airline employee’s] belief that the packages contained narcotics; and (4) that the only items found in Williams’ suitcase besides the five packages of cocaine were towels, dirty blankets, and a shirt with a cigarette burn.
Id. at 198. Because the presence of illegal narcotics in the packages was a foregone conclusion, Williams had no reasonable expectation of privacy in those contents. Accordingly, under the venerable Katz principle, see Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring), the officers’ observation of those contents did not constitute a “search,” and thus “a search warrant was unnecessary.” Williams, 41 F.3d at 198; See Jackson, 131 F.3d at 1108 (reaffirming that no “search” occurs when the plain view seizure doctrine properly applies to the contents of an opaque container).
Simply put, despite the majority’s labored efforts to the contrary, this case is not Williams or Corral. Most important, under a proper plain view seizure analysis, it cannot be said that a reasonable officer in King’s position had “knowledge approaching certainty,” Corral, 970 F.2d at 725, that the bag under Davis’s hospital bed contained evidence of a felonious shooting in which Davis was a “victim.”[14] The district court and the majority treat the bag of Davis’s clothing as analogous to the cellophane-wrapped cocaine in Williams. See Maj. Op. at 236 (holding that “the totality of the circumstances ... supports] the determination that it was a foregone conclusion the bag under Davis’ hospital bed contained the clothing he wore when he was shot,” and that the clothing was evidence of a crime). I disagree.
As a matter of law, based on what was known by the officers after they attempted to interview Davis at the hospital, the likelihood that the bag contained probative evidence of a felonious shooting in which Davis was a victim does not rise to the level of probable cause. In the first place, there is unwarranted confidence shown by the district court and the majority that Davis’s pants would contain a bullet hole. See id. at 236-37 (“We have little trouble, however, in concluding that Davis’ pants would contain a bullet hole, and would thus be incriminating evidence in the prosecution of his assailant. Such a conclusion is based on the circumstances, Davis’ appearance, and the location of his bullet wound.”). The facts of United States v. Jamison, 509 F.3d 623 (4th Cir.2007), illustrate why this confidence is misplaced.
*273 The defendant in Jamison was a felon who accidentally shot himself in the groin area with a gun he had been carrying in his waistband. 509 F.3d at 625. Like Davis here, when Jamison was transported by his associates to the hospital for treatment, he relayed to investigating officers a fanciful falsehood that he was the victim of an attempted robbery. Id. at 626. The investigating officer noticed Jamison’s clothing on a chair in the treatment room and confirmed by the absence of a bullet hole in Jamison’s pants that Jamison was lying about the circumstances surrounding how he was shot.[15] Id. It was far from “a foregone conclusion” that, apart from the likely presence of blood on Davis’s clothing, the contents of the bag would serve as useful evidence in the prosecution of an illusory “shooter” about whom Davis would provide no information. Indeed, the photograph in the record of Davis’s high-thigh wound depicts a wound that is entirely consistent with one that would be suffered from an accidental discharge of a weapon by someone carrying a firearm in his waistband.
Equally important, there can be scant doubt that, in view of Davis’s refusal to cooperate with the officers who responded to the hospital to investigate, the HCPD officers fairly quickly turned their attention to Davis as a suspect in criminal activity, just as Jamison quickly became a suspect in his own shooting. Indeed, even the government contends on appeal (contrary to the majority’s facile attempt to show that in seizing Davis’s personal property the Howard County police were seeking to “protect” Davis), that the police appropriately deemed Davis to be “not an innocent crime victim.” Govt’s Br. at 46-47 n. 18. But see Davis, 657 F.Supp.2d at 640 (“Davis was positively the victim of a violent crime.”).
The actions of the officers in searching the car in which Davis was transported to the hospital and in eventually arresting Davis and his friend bear out this highly likely scenario. Indeed, the facts of this case show that because Davis used a falsely made District of Columbia driver’s license bearing his photograph under the alias “Gary Edmonds,” the only way in which the HCPD could reliably identify Davis was to arrest him and take his fingerprints. That is exactly what they were determined to do and that is exactly what they did. In short, even the investigating officers did not believe Davis was a victim; rather, they were investigating his possible involvement in criminal activity. Thus, rather than accept uncritically the officers’ post hoc rationalization that they needed Davis’s clothing to prosecute the unknown person who allegedly shot him, under the circumstances of this case, “[w]e should be reiterating the usual exhortation: ‘Get a *274 warrant.’ ” United States v. Norman, 701 F.2d 295, 302 (4th Cir.) (Murnaghan, J., concurring), cert. denied, 464 U.S. 820, 104 S.Ct. 82, 78 L.Ed.2d 92 (1983).[16]
As should thus be apparent, the “incriminating” nature of the contents of the bag here was nowhere close to being so obvious that no “search” occurred- — -unlike in Williams. In Williams, the drug packaging at issue was so readily recognizable that even a lay person, the airline employee who originally opened the baggage, testified that she immediately reported her discovery because “the bags looked like dope.” See 41 F.3d at 198 (noting that “[bjecause Lee is a layperson, not trained in law enforcement, her belief that the five packages contained ‘dope’ strongly supports the district court’s conclusion that the contents of the packages were a foregone conclusion”). The hearing testimony in this case did not indicate that the bag was distinctive in any way; thus, the government did not satisfy its burden on that issue. Indeed, the district court noted that “[t]here was no testimony as to whether the bag was open or closed, or whether it was transparent, opaque, or somewhere in-between.” Davis, 657 F.Supp.2d at 638. Neither Detective King nor Lieutenant Lampe was able to provide a description of the bag beyond Lieutenant Lampe’s comment that it was probably plastic.
Moreover, the Williams court emphasized Detective Finkel’s testimony that, based on his ten years of experience in narcotics enforcement, packages of, the sort at issue “always ” contain narcotics. 41 F.3d at 198 (emphasis in original). In this case, Detective King testified on cross-examination that “the hospital makes a practice to secure any property that they take. Clothing from a victim, they place it under their bed.” J.A. 147. When asked the follow up question, “So you’re familiar it’s the hospital’s practice to secure that clothing in a white opaque plastic bag; is that correct?,” Detective King responded, “It’s been in different things. Sometimes it all depends on if somebody bags it or not.” Id. In addition, as stated - supra, neither Detective King nor Lieutenant Lampe was able to describe the bag. Detective King’s testimony clearly does not *275 rise to the level of familiarity or certainty expressed by Detective Finkel in Williams. Manifestly, it does not rise to Justice Stevens’s “virtually certain” metric. The government’s evidence of the nature of the bag and the surrounding circumstances was equivocal at best, and clearly did not rise to the level of virtual certainty that the bag would contain contraband, which the government would have to show to establish that no “search” of the bag’s contents occurred.
Williams is also inapposite on its facts in two additional meaningful respects, such that the case does not support, let alone dictate, the result reached by the majority. First, the Williams court, in language and reasoning that was wholly unnecessary to the outcome of its analysis, considered not only the extrinsic evidence of the contents of the packages, but also the physical appearance and character of the packages to bolster its conclusion, whereas the district court in this case considered only extrinsic evidence. Considering only extrinsic evidence, and not the physical appearance and character of the container itself, takes the “foregone conclusion” analysis too far from the origins of the plain view seizure container exception acknowledged in Sanders footnote 13, in which the Supreme Court provided the quintessential examples of a single-purpose container, namely “a kit of burglar tools or a gun case.” 442 U.S. at 764 n. 13, 99 S.Ct. 2586. The Sanders Court noted that the contents of such containers “can be inferred from their outward appearance.” Id. Narcotics packaging is so readily recognizable as to rise to the level of the archetypal kit of burglar tools or a gun case. A non-descript plastic bag does not so betray its contents.[17]
Second, and critically, the search in Williams was a search for contraband and not mere evidence of someone’s criminal act.[18] For the reasons expressed above, see supra pp. 264-65, in addition to his possessory interest in the bag and its contents, Davis clearly enjoyed a reasonable expectation of privacy in his own clothing and their contents every bit as much as he enjoyed-a reasonable expectation of privacy, as the majority rightly holds, in the *276 chemical facts concerning his biological material and blood.[19] Indeed, it is curious, to say the least, to reason as does the majority that Davis retained, for several years after the bag was seized at the hospital, a reasonable expectation of privacy in the character of his DNA molecules, but that he lacked any reasonable expectation of privacy in the presence of those molecules in his blood while they were embedded in his clothing and hidden from the government in a bag which was effectively in his actual possession at the hospital. Thus, I would limit Williams' and its reliance on extrinsic indicia of the container’s contents to cases involving the plain view seizure of containers holding contraband.
For all these reasons, Williams does not control the outcome in this case.[20]
c.
For the foregoing reasons, unlike the majority, I would hold, at minimum, that not only the extraction of Davis’s DNA, the creation of his DNA profile and its retention in the local DNA database violated Davis’s constitutional right to be free from unreasonable searches, but that the noneonsensual, warrantless search of the bag containing his personal effects likewise violated that right. Accordingly, I respectfully dissent from the majority’s contrary resolution of the merits of the Fourth Amendment issue. “[T]he value of the Fourth Amendment derives from the consideration thát only when it is applied evenhandedly — to smugglers, murderers, and rapists as well as to others — does it retain its effectiveness for the decent citizenry.” Norman, 701 F.2d 295 at 302 *277 (Murnaghan, J., concurring). I regret the majority’s distortion of the plain view doctrine in order to save the unconstitutional search challenged in this case.
III.
The majority, having concluded that only the extraction and analysis of Davis’s DNA by the PGCPD violated the Fourth Amendment, and having assumed that the retention of his DNA in the local CODIS database was a further violation, nevertheless refuses to apply the exclusionary rule. I respectfully dissent from that choice. I would find that the district court erred in admitting evidence flowing from the HCPD’s unlawful seizure and search of Davis’s clothing and the PGCPD’s unlawful extraction, analysis and retention of his DNA profile, including in particular the evidence of the match between the known sample obtained pursuant to the search warrant and DNA recovered from the scene of the Schwindler murder. Because this case does not fall within any version of the “good faith” exception recognized under extant Supreme Court or Fourth Circuit precedent, I would reject the district court’s decision not to apply the exclusionary rule.
The Fourth Amendment protects the fundamental “right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,” U.S. Const, amend. IV, but “contains no provision expressly precluding the use of evidence obtained in violation of its commands,” Arizona v.. Evans, 514 U.S. 1,10, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Thus, the Supreme Court created the exclusionary rule, an auxiliary to the Amendment which “compel[s] respect for the constitutional guaranty,” Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), by forbidding the use of illegally obtained evidence at trial. See Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (adopting federal exclusionary rule); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (applying exclusionary rule to the states through the Fourteenth Amendment). Suppression is not an automatic consequence of all Fourth Amendment violations, however. See Herring v. United States, 555 U.S. 135, 137, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).
The Supreme Court created the “good-faith” exception to the exclusionary rule in United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In Leon, the Court held that the exclusionary rule does not apply when the police conduct a search in “objectively reasonable reliance” on a warrant later held invalid. Id. at 922, 104 S.Ct. 3405; see also Massachusetts v. Sheppard, 468 U.S. 981, 990-91, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (companion case declining to apply exclusionary rule where warrant held invalid as a result of judge’s clerical error). In the twenty-eight years since deciding Leon, a sharply-divided Supreme Court has applied variations on the Leon good-faith exception in several specific circumstances. In Illinois v. Krull, 480 U.S. 340, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987), the Court applied the good-faith exception to a search conducted in reasonable reliance on a subsequently invalidated statute. Id. at 349-50, 107 S.Ct. 1160. In Evans, 514 U.S. 1, 115 S.Ct. 1185, the Court applied the good-faith exception where police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by non-law enforcement, judicial employees. Id. at 6, 14-16, 115 S.Ct. 1185.
More recently, in Herring, decided approximately nine months prior to the district court’s decision in this case, the Supreme Court addressed a question left *278 unresolved by Evans, namely “whether the evidence should be suppressed if police personnel were responsible for the error.” 555 U.S. at 142-43, 129 S.Ct. 695 (quoting Evans, 514 U.S. at 16 n. 5, 115 S.Ct. 1185) (internal quotation marks omitted). Considering whether the exclusionary rule applies where police failed to update records in a warrant database, leading to the unlawful arrest of the defendant on ■ the basis of a recalled warrant, the Herring Court held, over a spirited dissent, that where “the error was the result of isolated negligence attenuated from the arrest ... the jury should not be barred from considering all the evidence.” Id. at 137-38, 129 S.Ct. 695. The Court reasoned that, “when police mistakes are the result of negligence ..., rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not pay its way.” Id. at 147-48, 129 S.Ct. 695 (internal quotation marks omitted). Most recently, the Court in Davis v. United States, — U.S. -, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011), applied a further variation on the Leon good-faith exception where police conducted a search in objectively reasonable reliance upon binding judicial precedent that was later overruled. Id. at 2423-24.
The majority reasons that, “[i]n order to properly apply Leon, Herring, and Davis here, we must focus on the culpability of the actors who committed the violations.” Maj. Op. at 253. The majority assumes without discussion that Leon and its progeny govern here, and thus proceeds directly to the broad cost-benefit analysis that underlies the narrow holdings in those cases. As discussed infra, however, each of the cases upon which the majority relies is clearly distinguishable from the case at bar. Thus, the majority’s application of the good-faith exception to preclude suppression in this case marks a departure from the Supreme Court’s exclusionary rule precedents and represents a new, free-standing exception never sanctioned by the Court or by precedent'in this Circuit.
In Leon, Krull, Evans and Davis, the Supreme Court reasoned that exclusion does not serve to deter unconstitutional police conduct where the actor primarily responsible for the Fourth Amendment violation is not a law enforcement officer. See Leon, 468 U.S. 897, 104 S.Ct. 3405 (magistrate judge); Krull, 480 U.S. 340, 107 S.Ct. 1160 (legislators); Evans, 514 U.S. 1, 115 S.Ct. 1185 (clerk in the employ of the judiciary); Davis, 131 S.Ct. 2419 (judiciary). This rationale clearly does not apply here, where HCPD and PGCPD employees violated the Fourth Amendment. In this respect, our case is most like Herring, which also dealt with unconstitutional conduct by law enforcement personnel. Nevertheless, Herring is likewise inapplicable because it crafted a narrow exception to the exclusionary rule that applies only where “the error was the result of isolated negligence attenuated from arrest.” 555 U.S. at 137, 129 S.Ct. 695. The majority fails to recognize that neither of the qualifiers present in Herring, namely “isolated negligence” and “attenuation,” is present here.
Instead, the record in our case Shows unmistakably that the constitutionally violative conduct is not only deliberate and intentional but is systemic; most assuredly, it was not an isolated blunder. Detective King testified that, as on previous occasions when he has responded to Howard County General Hospital to investigate shootings, hospital personnel did not assist him in obtaining Davis’s effects. This statement indicates that Detective King has seized patients’ belongings in the manner at issue here on other occasions. See supra n. 11. In. addition, the DNA analyst *279 who entered Davis’s profile into the local CODIS database testified that she was aware that Davis had been cleared of suspicion in the Neal murder before his DNA profile was added to the local CODIS database.
Furthermore, the “Request for Examination” form submitted to the PGCPD Serology DNA Laboratory (“DNA Lab”) along with Davis’s bloody clothing indicated that “these samples are from a shooting the suspect was a victim of in Howard Co. MD.” Supp. J.A. 76. The DNA analyst testified that the database contained profiles of both suspects and victims, indicating that the PGCPD regularly retained the DNA profiles of persons, such as Davis, who had not been arrested, charged with, or convicted of any crime. The government confirmed at oral argument that it was the PGCPD’s policy to upload every DNA profile it analyzed into the local CO-DIS database, regardless of the individual’s status, the method by which the sample was obtained, or whether the sample might be tainted by an antecedent constitutional violation. Oral Arg. Tr. at 28:40. Thus, the record indicates that the PGCPD analyst and officers knew that Davis was a victim at the time the sample was collected, that Davis was not a suspect when his DNA profile was entered into the local database, and that it was the PGCPD’s policy and practice to retain the DNA profiles of such persons. Thus, by the government’s own admission, the constitutionally violative conduct was clearly systemic. See Hudson v. Michigan, 547 U.S. 586, 604, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (Kennedy, J., concurring in part and concurring in the judgment) (opining that, “[i]f a widespread pattern of violations were shown, and particularly if those violations were committed against persons who lacked the means or voice to mount an effective protest, there would be reason for grave concern”).
The expungement provisions in the Maryland and federal indexing statutes also recognize a privacy interest for those in Davis’s position. As the district court recognized, “[b]oth laws require that an individual’s DNA record be expunged from the database if the defendant is never convicted, his conviction is reversed or vacated, or the charges are dismissed.” Davis, 657 F.Supp.2d at 659 (citing 42 U.S.C. §§ 14132(d)(l)(A)(i)-(ii); 42 U.S.C. §§ 14132(d)(2)(A)(i)-(ii); Md'.Code Ann., Pub. Safety § 2-511). While “[t]he ex-pungement provisions do not directly apply to Davis’ situation because they are drafted specifically to address circumstances in which an individual’s DNA was placed in the database on the basis of a conviction or arrest,” I agree with the district court that “the construction of the statute strongly suggests that Congress and the Maryland legislature respected the privacy interest of those individuals never convicted for qualifying offenses, and did not intend for ordinary citizens’ or victims’ DNA to be included in the database.” Id.
In addition, unlike the constitutionally violative conduct at issue in Herring, the conduct in this case is not “attenuated” from the discovery of Davis’s identity as the source of the DNA recovered from the scene of the Schwindler murder; the cold hit which led to Davis’s arrest was a direct result of the seizure and search of his clothing and the subsequent extraction, analysis and retention of his DNA profile. Cf. Hudson, 547 U.S. at 592, 126 S.Ct. 2159 (exclusionary rule inapplicable where violation of the knock and announce rule was not but-for cause of obtaining evidence pursuant to search warrant). Given that the cold hit supplied the sole probable cause for the search warrant leading to the known DNA match, the causal connection required to invoke the exclusionary rule is clearly present in this case.
*280 As we recognized in United States v. Oscar-Torres, 507 F.3d 224 (4th Cir.2007), application of the exclusionary rule is the “usual remedy” where evidence of identity is derived from unlawful searches and seizures:
Indisputably, suppression of evidence obtained during illegal police conduct provides the usual remedy for Fourth Amendment violations. See Mapp v. Ohio, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Courts will also suppress evidence that is the indirect product of the illegal police activity as “fruit of the poisonous tree.” See Wong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Of course, not all evidence that “would not have come to light but for the illegal actions of the police” is suppressible as fruit of the poisonous tree. Id. Rather, the critical inquiry is “whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.” Id. (internal quotation marks omitted).
Id. at 227. There is no real dispute that the seizure of the bag containing Davis’s clothing, the search of the bag and of Davis’s clothing, including the extraction of his DNA therefrom, and the subsequent creation and uploading of his DNA profile, means that the identification evidence introduced at trial was the product of an “exploitation” of the searches and seizures at issue in this case.[21] Rather than noting the critical distinctions between our case and extant good-faith exception precedents, the majority invents an ad hoc version of the exception by focusing on broad principles espoused by the Herring Court, including most notably its admonition that the deterrent effect of exclusion must outweigh its costs. This is unsurprising, perhaps, given that the Herring Court’s “ ‘analysis’ ... far outruns the holding.” Wayne R. LaFave, The Smell of Herring: A Critique of the Supreme Court’s Latest Assault on the Exclusionary Rule, 99 J.Crim. L. & Criminology 757, 770 (2009). In other words, there is a gap between the holding of Herring, which is quite narrow, and its rationale, which sweeps quite broadly. We should not so readily depart from the narrow holding of Herring, and the Supreme Court’s other good-faith exception jurisprudence, given the critical role that the exclusionary rule plays in ensuring the vitality of the Fourth Amendment.
The rule provides an essential “incentive for the law enforcement profession as a whole to conduct themselves in accord with the Fourth Amendment,” Illinois v. Gates, 462 U.S. 213, 221, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (White, J., concurring in judgment), thereby “safeguarding] Fourth Amendment rights generally through its deterrent effect,” United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). See also Herring, 555 U.S. at 152, 129 S.Ct. 695 (Ginsburg, J., dissenting) (describing exclusionary rule as a “remedy necessary to *281 ensure that the Fourth Amendment’s prohibitions are observed in fact”) (internal quotation marks omitted); cf. United States v. Jones, 678 F.3d 298 (4th Cir.2012).[22]
In this case, the HCPD officers deliberately and intentionally dispossessed Davis of his personal property. The HCPD officers then deliberately and intentionally retained that property. Then, the HCPD deliberately and intentionally delivered that property to the PGCPD officers, who deliberately and intentionally made a request for it. Having thus obtained possession, the PGCPD officers then deliberately and intentionally delivered Davis’s property to their DNA lab for analysis and uploading into the local CODIS database, and, of course, the analyst, charged with knowledge that she was handling biological material taken from a crime victim, deliberately and intentionally uploaded the DNA profile into the database. This case is a poor candidate for the creation of a new variation on the good-faith exception to the exclusionary rule.
Davis has been convicted of a heinous crime. The cold-blooded mid-day murder of Jason Sehwindler, a man simply conscientiously going about his work to support himself and his family, understandably generates outrage and dismay, an all-too-common episode of modern life from which all decent people recoil in horror. There is little reason to doubt that customary, equally conscientious, work by dedicated state and federal law enforcement officers woúld have brought deserved justice to those who participated. Nevertheless, duty to the judicial oath requires that we apply the law faithfully and evenhandedly.[23]
In short, I would apply the exclusionary rule in this case and leave it to the Supreme Court to extend the good-faith exception to the particular situation now before us, should it see fit to do so. I am mindful that the obituary marking the long slow death of the exclusionary rule has been written long before the rule will be interred.[24] Understandably, perhaps, there has been no want of volunteers among the judiciary to serve as pallbearers. I regret this development and fear that a measurable lessening in liberty will result from this freeing of law enforcement from the constraints of the Fourth Amendment through the invention of an ad hoc good-faith exception to suppression of unlawfully obtained evidence. To quote the second Justice Harlan, “I can see no good *282 coming from this constitutional [misjadventure.” Ker v. California, 374 U.S. 23, 46, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (Harlan, J., concurring in the judgment). * * * * * *
For the reasons set forth, I respectfully dissent.

. The majority "assume[s], without deciding, that there was a separate Fourth Amendment violation in retaining Davis' DNA profile in the local CODIS database.” Maj. Op. at 233. While it is not critical to my analysis in this case, I would likely hold that under circumstances such as those presented here, the state action involved in (1) extracting Davis’s DNA from the biological material recovered from his clothing, (2) chemically analyzing that material to create a DNA profile, and (3) uploading the profile into the local DNA database essentially constitutes a single continuous course of constitutionally implicated endeavors subject to Fourth Amendment scrutiny. Governments undertake to engage in this full course of conduct inasmuch as the purpose of this extraordinary forensic science is to enable law enforcement to identify persons, and that cannot be achieved through less than the full protocol we have come to know. For present purposes, however, I join in the majority’s assumption.

. I would not reach the question whether the district court properly excluded the testimony of Dr. Jeffrey Neuschatz, Davis’s proposed expert on eyewitness identifications. The district court excluded Dr. Neuschatz’s testimony in significant part because it had previously decided to admit the DNA evidence, which meant that "the significance of eyewitness identification” in the case was "[not] high.” J.A. 2323. Because I would reverse the district court's denial of Davis’s motion to suppress the DNA evidence, that premise of the district court’s decision would no longer apply, and in a retrial without that evidence the court might vety well come to a different conclusion. Thus, I find it unnecessary to address the district court’s grant of the government’s motion to exclude Dr. Neuschatz’s testimony.

. Although the majority, following the lead of the parties, purports to identify three alleged *262 Fourth Amendment violations, as I explain within, a proper analysis of this case must distinguish as separate constitutionally cognizable invasions: (1) the seizure of the bag at the hospital followed by (2) the search of the bag. Indeed, as the majority’s own analysis shows, see Maj. Op. at 235 ("As to both the seizure of the bag and the subsequent search of the bag, the district court's reliance on United States v. Williams, 41 F.3d 192 (4th Cir.1994) was appropriate.”), the seizure and search of the bag are indeed distinct undertakings. Moreover, although Davis combined these two challenges in some ways, there is no question that he has challenged each distinct invasion of his rights. See Appellant’s Br. at 17 ("First, the police illegally seized and searched the white bag containing Mr. Davis' clothes beneath his hospital bed when he came in as a shooting victim four years prior to the Schwindler robbery and shooting.”).

. Unlike the majority, it is difficult if not impossible for me to imagine that a person, even a hospital patient undergoing treatment in an emergency room as was Davis, lacks a reasonable expectation of privacy in his underwear which is concealed by hospital personnel in a bag and left within easy reach of the patient.

. The very case relied on by the majority for its expansive application of the "lawful access" element of the plain view doctrine in response to this dissent makes clear that the typical plain view seizure case involves concern for protection of a citizen’s spatial privacy, e.g., the lawfulness of an entry, not with the distinct constitutional question of whether a seizure of a constitutionally protected “effect” from the personal possession of its owner is "lawful.” See Maj. Op. at 234 (contending that the "lawful right of access” requirement “is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances”; thus, while "lawfully positioned” “refers to where the officer stands when she sees the item,” "lawful right of access” refers "to where she must be to retrieve the item”) (quoting Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir.2004) (holding that disputed issue of fact precluded summary judgment for officers in plaintiff’s Fourth Amendment claim under 42 U.S.C. § 1983 where plaintiff disputed officers' assertion that they could see handgun in his car while they were standing outside the vehicle, and'thus permissibly entered vehicle to retrieve the firearm and then arrested plaintiff)).
Nor does the majority’s invocation of Washington v. Chrisman, 455 U.S. 1, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982), see Maj. Op. at 234, aid its cause. In that case, "the officer noticed seeds and a small pipe lying on a desk 8 to 10 feet from where he was standing [in the threshold of defendant’s college dormitory room after having detained the defendant's roommate for underage possession of an alcoholic beverage]. From his training and experience, the officer believed the seeds were marihuana and the pipe was of a type used to smoke marihuana. He entered the room and examined the pipe and seeds, confirming that the seeds were marihuana and observing that the pipe smelled of marihuana.” 455 U.S. at 4, 102 S.Ct. 812. Chrisman’s. expectation of privacy in his room gave way to the officer’s duty to keep in close contact with the roommate, whom the officer had allowed to reenter the room to retrieve his identification, and who had actually consented to the officer’s presence. Id. at 3, 102 S.Ct. 812. In short, Chrisman has nothing whatsoever to do with plain view seizures of, or "lawful access” to the contents of, containers.

. Imagine, for instance, that a murder suspect's father is sitting in a fast food restaurant eating a salad and reading the morning paper. A homicide detective working the case has been told by a reliable informant that the suspect has admitted to the informant that he, the suspect, had written a full confession and mailed it to his father and that his father keeps the letter with him at all times in a distinctive black briefcase that his father carries wherever he goes. The black briefcase described by the informant is resting on the floor of the fast food restaurant at the feet of the father when the detective enters the restaurant. The detective seizes the briefcase and, without consent or a warrant, immediately opens it. He observes instantly the letter and, quite unexpectedly, wads of counterfeit U.S. currency. The letter is used by the state to prosecute the son for homicide and the possession of counterfeit currency charge is prosecuted in federal court against the father.
Does the majority truly believe that the detective, having what the majority would call “lawful access” to the briefcase, and with probable cause to believe that evidence of a murder would be found in the briefcase, i.e., it was “immediately apparent” (based on the highly reliable information possessed by the detective) that the container held evidence of a criminal offense, could seize the briefcase and search it on the basis of the plain view seizure exception?
Of course not.
Arguably, the briefcase could be seized on the basis of exigency, see United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991), but surely even the majority would agree that a warrant would be required to search the briefcase. Even apart from a nice question of the son's standing to challenge the search of the father's briefcase, there clearly is no standing issue as to the father, and the plain view exception simply could not justify the search of the briefcase, despite the “virtual certainty” that evidence of a criminal offense was contained therein. So it is here.

. In my view, the nonconsensual, warrantless seizure of the bag in this case could only be justified by exigent circumstances, rather than by the plain view seizure doctrine. It appears, however, that the government did not press such an argument before the district court, and with good reason. Although the notion that police need clothes with bullet holes in them to help prove someone got shot is beyond fanciful, there is some support for the view that Detective King had probable cause to believe that the bag beneath Davis’s bed contained evidence of his shooting. But see infra at 271-73 (explaining why the officers’ interaction with Davis demonstrated conclusively that they did not believe his story and, accordingly, they lacked probable cause to believe he had been the victim of a felonious shooting). Therefore, particularly given Detective King’s testimony that Davis was uncooperative in response to questioning about the crime, King could reasonably have feared that the clothing would disappear due to a deliberate act of Davis or an inadvertent act of hospital personnel. On the other hand, a police officer might have been posted to safeguard the clothing until a warrant was obtained. Regardless, the government does not raise this argument and, as discussed infra, the subsequent search of the bag was unconstitutional in any event.
Indeed, as both the majority and district court opinions demonstrate, application of an exigency exception to the warrant requirement would not save the subsequent search of the bag in this case because no conceivable exigency would apply once the bag was in the custody of law enforcement.

. It is evident that the police removed Davis’s clothing from the bag at some point, but the record does not indicate when the police first opened the bag, so it is not clear when the warrantless container search actually occurred. Lieutenant Lampe testified that the clothing was still in the bag when he arrived at the hospital and retrieved it from Detective King. He recalled that the bag was plastic, but could not recall what it looked like, and he stated that he did not inspect the clothes right away.
To the extent the majority laments the officers’ failure of memory about what the bag looked like and what precisely they did many years before they were called to testify on behalf of the government in. this case, see Maj. Op. 236 n. 15, the majority has done little more than highlight still another reason for the imperative of the warrant — issuing function of the state and federal courts. Had the officers properly conducted themselves in searching the bag on the authority of a judicial warrant, there would be no basis for the majority's lament. “Ever since 1878 when Mr. Justice Field’s opinion for the Court in Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877 (1877), established that sealed packages in the mail cannot be opened without a warrant, it has been settled that an officer’s authority to possess a package is distinct from his authority to examine its contents.” Walter v. United States, 447 U.S. 649, 654, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980) (plurality opinion) (citing Arkansas v. Sanders,. 442 U.S. 753, 758, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and United States v. Chadwick, 433 U.S. 1, 10, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977)).

. The majority’s conclusory assertion that, "[T]he subsequent search of the bag (whether to identify or examine its contents), was warranted if it was a foregone conclusion that the bag contained the clothing, which was evidence of a crime,” Maj. Op. at 235, is confounding. As explained below, King could only have opened the bag and inspected its contents if their incriminating nature was so obvious that no “search” occurred — but the majority agrees that a search did occur. Of course, having chosen to ignore entirely this dissent’s reliance on Chadwick, Robbins, and Sanders, the majority’s sole escape is to stand silent in the face of clearly applicable Supreme Court precedents which cannot rationally be distinguished. Those cases, among others, make clear that whether a search occurs is not simply a matter of "labeling.” Cf. Maj. Op. at 232-33 n. 11.

. “As Robbins v. California ... has established, it takes an open package, or one whose configuration is distinctive as to its contents (i.e., a kit of burglary tools or a gun case) to bring into play the plain view exception to the generally unyielding rule that a *269 warrant must first be obtained.'' Blair v. United States, 665 F.2d 500, 513 (4th Cir. 1981) (Murnaghan, J., dissenting); see id. at 510 (Murnaghan, J., dissenting) ("It is elementary that probable cause alone does not permit a search. It only provides a substantiating basis for issuance of a warrant.”).

. To the extent Sanders and the Robbins plurality required that officers who have probable cause that a vehicle contained evidence of crime must obtain a warrant to search closed containers in the vehicle, those cases were overruled. See United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982); California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). The discussions in Sanders and Robbins of when the contents of a closed, opaque container are nonetheless obvious, however, remain accurate and unaltered. See Williams, 41 F.3d at 196.

. The majority suggests, utterly without support in the record, that Detective King’s testimony that he observed "a bag underneath of the hospital bed that contained clothing,” Maj. Op. at 235-36 (citing J.A. 140), "fairly supports an inference that Officer King could see the clothing through the bag or that the bag was partially open, revealing clothing,” id. at 236. The majority's reasoning is clearly flawed; Detective King's conclusoiy statement reflecting his own personal belief that the bag contained clothing does nothing to confirm that the belief was anything but an unfounded assumption. For instance, if an employee of a McDonald's restaurant stated that a happy meal contained French fries, we could not reasonably infer that the employee had looked into the box. Instead, it is most likely that the employee merely assumed that the customer had chosen that classic side item, when the customer may well have thought better and opted for apple slices instead.
Contrary to the majority’s speculation that Detective King seized the clothing because he could actually see it in or through the bag, the government concedes in its brief that Detective King's nonconsensual, warrantless seizure of Davis’s personal property was simply King’s standard operating procedure. See Govt’s Br. at 19 ("As was his practice in previous shooting investigations, Detective King secured the victim’s clothing, which had been removed by hospital staff to treat the injury....”). The district court’s analysis on this point could not be clearer: "There was no testimony as to whether the bag was open or closed, or whether it was transparent, opaque, or somewhere in-between.” Davis, 657 F.Supp.2d at 638. The majority is not entitled to enhance this negative finding so that it becomes the basis for an inference favorable to the government.
Thus, the majority’s extraordinary appellate factfinding ignores the undisputed applicability of the rule that in this case the government bore the burden of proof to establish all the facts necessary to the existence of whatever warrant exception might save the search and seizure in this case, see supra pp. 261-63. The majority indulges a so-called "inference” never propounded by the government or drawn by the district court, and not supported by any finding of the district court, in favor of the government. See, e.g., Maj. Op. at 236 ("Nothing in the record contradicts such a conclusion.”). Davis had no burden to disprove anything regarding the lawfulness of the search of the bag. Any absence of evidence on the point should count against the party with the burden of proof, here the government.

. The constitutionality of this corollary to the plain view seizure doctrine is widely accepted, but there seems to be a circuit split with respect to whether the "foregone conclusion” analysis incorporates extrinsic evidence and/or an officer’s specialized knowledge. In 'Williams we considered relevant that the officer had years of experience in narcotics investigations. 41 F.3d at 198. Other circuits have instead analyzed the question from the objective viewpoint of a reasonable layperson. See, . e.g., United States v. Gust, 405 F.3d 797, 803 (9th Cir.2005) (“[C]ourts should assess the nature of a container primarily with reference to general social norms rather than solely by the experience and expertise of law enforcement officers.”) (internal quotation marks and alteration omitted); United States v. Meada, 408 F.3d 14, 23 (1st Cir.2005) (holding that the defendant had no reasonable expectation of privacy in the contents of a container that was labeled "GUN GUARD” and thus was "readily identifiable as a gun case”); United States v. Villarreal, 963 F.2d 770, 775-76 (5th Cir.1992) (holding that even though fifty-five gallon drums were labeled "phosphoric acid,” their contents could not necessarily be “inferred”; "The fact that the exterior of a container purports to reveal some information about its contents does not necessarily mean that its owner has no reasonable expectation that those contents will remain free from inspection by others.”); United States v. Bonitz, 826 F.2d 954, 956 (10th Cir.1987) ("This hard plastic case did not reveal its contents to the trial court even though it could perhaps have been identified as a gun case by a firearms expert.”). I believe the latter view is the proper one, because it is consistent with the underlying rationale that a person does not maintain a reasonable expectation of privacy in contents of a container that are essentially open to view.

. As noted above, a determination whether "historical facts satisfy a constitutional standard” is reviewed de novo. Gwinn, 219 F.3d at 331. The question whether the information available to Detective King rendered the incriminating nature of the contents a "foregone conclusion” is such a determination, as the historical facts surrounding the seizure of the bag are not in dispute.

. We described this turn of events as follows in our opinion reversing the district court’s grant of Jamison’s motion to suppress evidence for violation of the Miranda doctrine:
Without securing Jamison’s consent, Detective Macer examined Jamison’s injury, partially exposing his genitalia. He found charring and stippling at the entry wound consistent with a shot fired at close range. He further observed a downward trajectory from the entry wound to the exit wound. Finding these facts to be in tension with Jamison’s account of the shooting, Detective Macer then examined Jamison’s clothing and found no bullet holes. Detective Macer again asked Jamison to explain the shooting; Jamison repeated that he was shot while using drugs. When Detective Macer explained that his observations seemed inconsistent with Jamison’s story, Jamison admitted that he shot himself with a handgun and threw the gun away. Detective Macer asked Jamison to reveal the location of the gun so that it could be secured, but Jamison refused, explaining that he was on probation.
Jamison, 509 F.3d at 626-27 (footnote omitted).

. A unanimous Supreme Court of Georgia recently reached the same conclusion on material facts nearly identical to those here in an interlocutory appeal in a capital case. In Clay v. State, 290 Ga. 822, 725 S.E.2d 260 (2012), an officer had seized a bag containing a murder suspect's bloody clothing while the suspect (who, unlike Davis, was unconscious at the time of the seizure) was undergoing treatment at a hospital. 725 S.E.2d at 264, 269. The court found that the officers were not justified in opening the bag because "all that was in plain view when Officer Cupp seized the bagged clothing from the counter was the pink and white personal effects bag itself.” Id. at 269. “[W]ithout opening the bag, it was not a 'foregone conclusion’ that the bag contained [the suspect’s] bloody clothes,” and so the "full-blown search of the bag” constituted an unlawful search. Id.
Concomitantly, Davis cites to us, as he cited to the district court, a raft of cases supporting the unremarkable proposition, largely accepted by the district court but ignored by the majority, that a hospital patient retains his constitutionally protected interests in his .clothing removed by hospital personnel in the course of their rendering treatment to him. See Appellant’s Br. at 23-24 (citing Jones v. State, 648 So.2d 669 (Fla. 1994)); People v. Jordan, 187 Mich.App. 582, 468 N.W.2d 294, 301 (1991); Commonwealth v. Silo, 480 Pa. 15, 389 A.2d 62, 63-67 (1978); People v. Watt, 118 Misc.2d 930, 462 N.Y.S.2d 389, 391-92 (N.Y.Sup.Ct.1983); Morris v. Commonwealth, 208 Va. 331, 157 S.E.2d 191, 194 (1967); People v. Hayes, 154 Misc.2d 429, 430-34, 584 N.Y.S.2d 1001 (N.Y.Sup.Ct.1992); State v. Lopez, 197 W.Va. 556, 476 S.E.2d 227, 231-34 (W.V.1996). Not a single one of these courts accepted the deeply flawed conception of the plain view doctrine applied by the district court in this case and accepted here by the majority.

. None of the cases cited by the government in support of its reconceptualization of the plain view seizure' doctrine are to the contrary. See United States v. Jackson, 381 F.3d 984 (10th Cir.2004) (after officer searched baby powder container with defendant’s consent and discovered cocaine secreted inside, officer could replace lid to container, arrest defendant, and then reopen the container at the police station without obtaining a warrant); United States v. Eschweiler, 745 F.2d 435, 439 (7th Cir.1984) (during search of premises, key to safety deposit box discovered in an envelope marked "safety deposit box”); United States v. Morgan, 744 F.2d 1215, 1222 (6th Cir.1984) (after airline employee opened suspicious package and discovered container marked with names of controlled substances used to dilute illegal narcotics, and then without a request by drug agents, reopened suitcase when drug agents arrived, chemicals were in "plain view” of agents and marked containers could be opened without a warrant).

. Of course, I do not seek a return to the “mere evidence” doctrine discarded by the Supreme Court in Warden v. Hayden, 387 U.S. 294, 301-02, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). Rather, the point here is that my search of Supreme Court and circuit authority, as I discuss in the text, does not reveal an instance in which a law enforcement officer has been authorized to seize a closed, opaque container containing non-contraband personalty from the possession of a person on the basis of the plain view exception. In such circumstances, even assuming a seizure is allowed, absent some applicable warrant exception, if the ensuing search of the container was without a warrant, the search violates the Fourth Amendment. Ample Supreme Court authority supports this view. See supra pp. 263-66.

. In contrast, one never has a reasonable expectation of privacy in regard to his possession of contraband. See United States v. Moore, 562 F.2d 106, 111 (1st Cir.1977) (observing that "the possessors of [contraband and stolen property] have no legitimate expectation of -privacy in substances which they have no right to possess at all”), cert. denied, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978); cf. Jacobsen, 466 U.S. at 123, 104 S.Ct. 1652 ("A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.”). Jacobsen and the cases relied on by the majority, see Maj. Op. at 237-38, are entirely consistent with this 'longstanding rule. See, e.g., United States v. Smith, 459 F.3d 1276, 1293 (11th Cir.2006) ' (plain view seizure of child pornography in the course of a search for narcotics); United States v. Rodriguez, 601 F.3d 402, 408 (5th Cir.2010) (where officers came upon a sawed-off shotgun in the course of responding to a domestic violence call, the court reasoned that, "The shotgun was properly seized on a temporary basis to secure it so that the officers could investigate the domestic disturbance call. Once seized for this purpose, the incriminating nature of the weapon became apparent and it was then subject to permanent seizure as contraband.”).

. In fairness to my well-meaning colleagues in the majority, they are not the first judges to misapply the plain view seizure doctrine. See, e.g., Boone v. Spurgess, 385 F.3d 923, 928 (6th Cir.2004) (discussed supra n. 5.) For example, in jurisdictions such as Maryland, where transporting an unsecured handgun in a vehicle is generally prohibited, if during a traffic stop an officer observed from outside the vehicle the barrel of a handgun, it is not the plain view seizure doctrine that authorizes ■ the officer to enter the vehicle to seize .the weapon. Rather, now with probable cause to arrest all the occupants, see Maryland v. Pringle, 540 U.S. 366, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003), and with probable cause to believe that the vehicle contains evidence of a criminal offense, the officer can search the vehicle and seize the firearm under either the search incident to arrest exception or the automobile exception to the warrant requirement. See id. The officer's view of the firearm was certainly “plain” in the "Merriam Webster” sense, but there is no occasion for proper application of the plain view seizure doctrine. Whether such cases come to the court by virtue of governmental theorizing or otherwise I cannot say, but we should guard against, rather than embrace, such distortions of doctrine.

. We and other circuits have recognized what is surely obvious: the Leon good-faith exception does not salvage evidence seized on the authority of a tainted search warrant, i.e., one in which probable cause is based on the fruits of a prior illegal search, as in this case. See United States v. Mowatt, 513 F.3d 395, 405 (4th Cir.2008) (good-faith exception does not apply where search warrant was prompted by previous warrantless illegal search), abrogated on other grounds, Kentucky v. King, - U.S. -, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011); United States v. McGough, 412 F.3d 1232, 1240 (11th Cir.2005); United States v. Reilly, 76 F.3d 1271, 1280 (2d Cir.1996); United States v. Scales, 903 F.2d 765, 768 (10th Cir.1990); United States v. Wanless, 882 F.2d 1459, 1466 (9th Cir.1989).

. As we explained in Jones,
"the exclusionary rule is our sole means of ensuring that police refrain from engaging in the unwarranted harassment or unlawful seizure of anyone,” regardless of where that person resides or visits. United States v. Foster, 634 F.3d 243, 249 (4th Cir.2011). Accordingly, we find the exclusion of evidence to be the proper remedy in this case because of the "the potential ... to deter wrongful police conduct.” See Herring v. United States, 555 U.S. 135, 137, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009).
678 F.3d at 305, n. 7.

. I respect my good colleagues' discomfort with a reversal in this case, a discomfort that is shared by all members of this panel. Cf. Blair, 665 F.2d at 509 (Murnaghan, J., dissenting) (“Whenever the exclusionary rule applies, with the resulting suppression of trenchant evidence of guilt, and the substantial and regrettable consequence that an offender against society may go free, the judge is apt to wince or at least to feel a twinge.”). Nevertheless, without clearer; more definitive instructions from the Supreme Court than those relied on by the majority, "We should not avoid or vitiate the effectiveness of the exclusionary rule by distorting what constitutes the essential ingredients of a proper search or seizure.” Id.

.See Adam Liptak, Supreme Court Edging Closer to Repeal of Evidence Ruling, N.Y. Times, Jan. 31, 2009, at Al.