**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ricardo WILLIAMS, Defendant–
Appellant.**

No. 93–5723.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 29, 1994.

Decided Dec. 5, 1994.

**ARGUED:** William Benjamin Moffitt, Moffitt, Zwerling & Kemler, P.C., Alexandria, VA, for appellant. Vincent L. Gambale, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Kyle W. O'Dowd, Moffitt, Zwerling & Kemler, P.C., Alexandria, VA, for appellant. Helen F. Fahey, U.S. Atty., Nash W. Schott, Asst. U.S. Atty., Office of the U.S. Atty., Alexandria, VA, for appellee.

Before HALL, NIEMEYER, and HAMILTON, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge HALL and Judge NIEMEYER joined.

## OPINION

HAMILTON, Circuit Judge:

Ricardo Williams (Williams) appeals his conviction for possession of cocaine with intent to distribute. *See* 21 U.S.C.A. § 841(a)(1) (West 1981). For the reasons that follow, we affirm.

### I.

On March 13, 1993, a snowstorm resulted in an accumulation of lost or delayed luggage in the America West Airlines (America West) baggage claim area at the Columbus, Ohio airport (Columbus Airport). Jacklyn Lee (Lee), the baggage service agent for America West on duty that day, received a report from Robert Walsh (Walsh), an America West passenger, that his suitcase was missing. Although the report described Walsh's suitcase and its contents, it did not state a baggage claim number. Lee located a suitcase matching the description of Walsh's suitcase with baggage claim number 126780, indicating that the suitcase had traveled on a flight originating in Los Angeles, California, stopping in Phoenix, Arizona, and was ultimately destined for Washington, D.C. Pursuant to airline procedure, Lee opened the suitcase in order to match its contents with the contents described in Walsh's lost baggage report. Upon Lee's opening the suitcase, two packages fell out, wrapped heavily in cellophane and a layer of brown material. There were three other similarly wrapped packages in the suitcase. Lee testified at Williams' suppression hearing that "the bags looked like dope." (J.A. 38). Lee further testified that the package she handled "felt kind of light." The suitcase also contained two dirty blankets, eight towels and one shirt with a cigarette burn, but the suitcase contained no other clothing or items that a person normally carries while traveling across the country. Lee testified that the other "very unusual" contents of the suitcase (referring to the towels and dirty blankets) added to her suspicion that the cellophane wrapped packages contained narcotics. (J.A. 45).

That night, the Columbus police seized the suitcase from America West's possession and took it to the office of the airport police. Specifically, Columbus Police Detective Richard Finkel (Detective Finkel), a ten-year narcotics enforcement veteran, testified at Williams' suppression hearing that he had arrived at the America West baggage claim area at approximately 11:20 p.m., and as soon as Lee displayed the contents of the suitcase to him, he immediately knew that the packages contained narcotics. Detective Finkel further testified that in his experience, similarly wrapped packages always contained narcotics, and in this case, there was the added factor of the "rest of the suitcase's" contents or the lack thereof: "no clothing, no shirts, no ties, pants or anything, just the . . . dirty blankets . . . and . . . some towels." (J.A. 61). Thus, Detective Finkel had "no doubt at all" that the five similarly wrapped packages contained narcotics. (J.A. 62).

While at the airport police office, Detective Finkel's partner removed the cellophane wrapping from one of the packages, poked a hole in the opaque material surrounding its contents and removed a small quantity of white powder. A field test confirmed that the powder was cocaine. It was subsequently confirmed by testing that the four remaining packages also contained cocaine and the aggregate weight of the cocaine from all five packages was 4,967 grams. (J.A. 360).

Three days later, on March 15, 1993, Columbus Police Detective Dan Arledge removed the suitcase containing the cocaine from the airport police property room and took it to Washington National Airport (National Airport) in order to conduct a controlled delivery. That same day, Washington, D.C. Police Detective Edward Curley (Detective Curley) provided America West employees at National Airport the suitcase's baggage claim number (126780) and asked them to report any inquiries regarding the suitcase. At approximately 8:50 p.m., America West employee Jonathan Hanlin (Hanlin) received a telephone call from a man inquiring about the suitcase. Hanlin elicited from

the man that he had not filled out a delayed baggage report and that he wanted to pick up the suitcase himself rather than have the airline deliver it. The man described the suitcase and provided baggage claim number 126780; both matched the description and baggage claim number of the suitcase, containing the five packages of cocaine, found at the Columbus Airport. When Hanlin insisted that the man give him a name, address, and telephone number, the man identified himself as "Wilson," stated that he was staying in room 412 at the Crystal City Holiday Inn and purportedly gave the room's telephone number. Hanlin alerted his supervisor, who, in turn, immediately alerted the police at National Airport. Detective Curley testified at trial that he called the Crystal City Holiday Inn, and a desk clerk informed him that on that day "there was no Mr. Wilson in room 412." (J.A. 247). Detective Curley also discovered that the telephone number was incorrect.

Approximately thirty minutes later, Williams approached Andrew McMenimen (McMenimen) at National Airport's America West ticket counter. Williams handed McMenimen a baggage claim check with number 126780, the same number as the baggage claim tag on the suitcase containing the five packages of cocaine, and stated: "I called, and they said my bag was here." (J.A. 284). McMenimen stepped into the room behind the counter where Detective Curley was positioned and showed Detective Curley the baggage claim check. Detective Curley instructed McMenimen to return the baggage claim check to the man, inform him that the computer had erroneously indicated that his suitcase was at the airport, but that it was on the flight just arriving, and he could retrieve it at the nearby America West baggage carousel. McMenimen complied.

While under police surveillance, Williams and a skycap waited approximately ten minutes for the suitcase to appear on the America West baggage carousel. While waiting, Williams told the skycap that he had returned a few days earlier from Los Angeles, but his bag had been delayed because of bad weather. Williams declined the skycap's offer to retrieve the suitcase from the America West baggage carousel, stating that he would retrieve it himself. Thereafter, Williams retrieved the suitcase containing the five packages of cocaine, examined the baggage tag, and removed it from the suitcase. Leaving the suitcase with the skycap, Williams walked over to the America West ticket counter and gave the baggage tag to a ticket agent. The baggage tag number matched the baggage claim check number that Williams had presented to McMenimen approximately ten minutes earlier. The claim check which Williams had shown McMenimen before he retrieved the suitcase was never found.

Subsequently, as Williams and the skycap walked toward an exit with the suitcase, the police arrested Williams and took him and the suitcase to the airport police office where Williams repeatedly disclaimed any knowledge of the suitcase, stating that he had never seen it before and the skycap rather than he had retrieved it from the America West baggage carousel. Williams also denied that he had inquired about the suitcase at the ticket counter; rather, Williams claimed that he only inquired about the arriving flight of a friend. On being arrested, the police found seven hundred dollars in cash and a pager on Williams' person. Records from the pager company showed that during the three weeks immediately preceding Williams' arrest, the pager had received 1,252 calls—over fifty calls per day.

Williams was indicted by a federal grand jury for possession of cocaine with intent to distribute in violation of 21 U.S.C.A. § 841(a)(1) (West 1981). Williams filed a motion to suppress the cocaine found in the five packages, contending that the police had illegally searched them. Williams also filed a motion to suppress his postarrest statements contending they were fruits of an illegal arrest. The government successfully opposed both motions.

A trial commenced on June 21, 1993, and after the government rested, Williams moved for a judgment of acquittal. *See* Fed. R.Crim.P. 29(a). The district court denied his motion, and Williams rested without presenting any evidence. The jury returned a verdict of guilty on June 23, 1993. On Au-

gust 20, 1993, the district court sentenced Williams to a term of imprisonment of ninety-seven months and four years of supervised release.

Williams appeals his conviction, raising four contentions: (1) whether the district court erred in admitting evidence derived from the government's search of the five packages; (2) whether probable cause supported his arrest, which would in turn determine whether the district court erred in admitting Williams' postarrest statements as fruits of an illegal arrest; (3) whether substantial evidence supported his conviction; and (4) whether the district court erred in admitting Detective Curley's statement that "there was no Mr. Wilson in room 412" at the Crystal City Holiday Inn on the ground that it was hearsay. (J.A. 247).

## II.

■ Initially, Williams challenges the search of the five opaque wrapped packages found in his suitcase, containing approximately five kilograms of cocaine. He contends that the plain view exception to the warrant requirement cannot support the search because the contents of the five packages were not a foregone conclusion.[1] Williams does not argue that the police lacked probable cause to seize the five packages under the plain view doctrine; rather, he asserts that the government needed a search warrant to open them and test the nature of their contents. Whether the plain view exception to the warrant requirement supported the officer's search of these packages is a question of law that we review *de novo*. *See United States v. Daughtrey*, 874 F.2d 213, 217 (1989).

■ Although Williams does not challenge the warrantless seizure of the five packages, we will begin our analysis with a brief discussion of this issue in order to better illuminate our later analysis of the legality of the warrantless search. Under certain circumstances, the police may seize the contents of a container found in a lawful-

ly accessed place, without a warrant, if the contents are in plain view. *See Arkansas v. Sanders*, 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979) (plurality opinion) ("[I]n some cases the contents of a package will be open to 'plain view,' thereby obviating the need for a warrant."), *overruled on other grounds, California v. Acevedo*, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). The rationale for this doctrine rests on the notion that the Fourth Amendment does not protect expectations of privacy that society does not consider reasonable. *See id.* The following three conditions must be satisfied in order to justify the warrantless seizure of an item under the plain view doctrine: (1) the seizing officer must be lawfully present at the place from which he can plainly view the evidence; (2) the officer has a lawful right of access to the object itself; and (3) it is immediately apparent that the item seized is incriminating on its face. *See Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *United States v. Legg*, 18 F.3d 240, 242 (4th Cir.1994), *cert. denied*, —— U.S. ——, 114 S.Ct. 2761, 129 L.Ed.2d 876 (1994).

All three conditions were satisfied in this case, and, thus, the seizure of the five packages was lawful. First, Detective Finkel and his partner were lawfully present in the Columbus Airport police office when they viewed the packages. Second, Detective Finkel and his partner had a lawful right of access to the packages, because Lee had previously discovered them and destroyed any privacy interest Williams may have had. *See United States v. Jacobsen*, 466 U.S. 109, 115, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984) (noting if an initial search is not protected by the Fourth Amendment, such as a private search, then a later search by the government to the same effect is also free from Fourth Amendment constraints). Third, because the packages were wrapped in heavy cellophane with a brown opaque material inside, and were found with towels,

---

1. Only one of the five packages was opened at the Columbus Airport by Detective Finkel's partner and its contents field tested before Williams was arrested. Presumably, the authorities opened the other four packages at a later time. At trial, the government presented the cocaine found in all five packages as evidence. (J.A. 360).

dirty blankets and a shirt in an otherwise empty suitcase, there is no doubt that their incriminating nature was immediately apparent to Detective Finkel, who testified that in his ten years of experience such packages always contained narcotics.

■ Having concluded that the warrantless seizure of the packages was lawful, we must now resolve whether the warrantless search of the packages was likewise lawful because, although the plain view doctrine may support the warrantless seizure of a container believed to contain contraband, any subsequent search of its concealed contents must either be accompanied by a search warrant or justified by one of the exceptions to the warrant requirement. *See Jacobsen*, 466 U.S. at 114, 104 S.Ct. at 1657 ("[e]ven when government agents may lawfully seize ... a package to protect loss or destruction of suspected contraband, the Fourth Amendment requires that they obtain a warrant before examining the contents of such a package") (footnote omitted); *Texas v. Brown*, 460 U.S. 730 at 749–51, 103 S.Ct. 1535 at 1547–48, 75 L.Ed.2d 502 (1983) (Stevens, J., concurring) (plain view doctrine supports the warrantless seizure of a closed container but not the warrantless search of its contents that were not visible to the police); *United States v. Corral*, 970 F.2d 719, 725 (10th Cir.1992) ("In cases involving closed containers ... the plain view doctrine may support the warrantless seizure of a container believed to contain contraband but any subsequent search of the concealed contents of the container must be accompanied by a warrant or justified by one of the exceptions to the warrant requirement."). Courts have drawn a distinction between the plain view seizure of a container and the subsequent search of that container, because its

seizure under the plain view doctrine "does not compromise the interest in preserving the privacy of its contents," while its search does. *Horton*, 496 U.S. at 141 n. 11, 110 S.Ct. at 2310 n. 11; *see United States v. Donnes*, 947 F.2d 1430, 1436–37 (10th Cir. 1991).

■ As a consequence, to protect the privacy interest of the contents of a container, courts will allow a search of a container following its plain view seizure only "where the contents of a seized container are a foregone conclusion." *Corral*, 970 F.2d at 725. The court in *Corral* reasoned that "when a container is not closed, or transparent, or when its distinctive configuration proclaims its contents, the container supports no reasonable expectation of privacy and the contents can be said to be in plain view." *Id.* (internal quotations omitted) (citations omitted). In determining whether the contents of a container are a foregone conclusion, the circumstances under which an officer finds the container may add to the apparent nature of its contents. *See Blair v. United States*, 665 F.2d 500, 507 (4th Cir.1981) (considering the circumstances in which the containers were found in upholding the warrantless search of closed marijuana bales under the plain view doctrine).[2]

In the instant case, compelling circumstances existed that lead us to conclude that the cocaine in the five packages was properly the subject of a plain view search, thus excusing the need for a search warrant. The cellophane wrapped packages found in Williams' suitcase "spoke volumes as to [their] contents—particularly to the trained eye of the officer." *Brown*, 460 U.S. at 743, 103 S.Ct. at 1544. For instance, from the appearance and size of the packages, heavily wrapped in cellophane with a brown opaque

2. In *Blair*, the Maryland Marine police (police) boarded a sailboat and discovered several bales, some of which had marijuana residue scattered on top, inside two open hatches. The police also discovered what appeared to be marijuana in a small open container in the galley area. *Blair*, 665 F.2d at 503. The bales consisted of marijuana that had been packaged in cardboard boxes, some of which had also been wrapped in burlap and secured by tape. "Either prior to or during the unloading, however, some of the packages had split and broken open, revealing their con-

tents." *Id.* Without having obtained a search warrant, Drug Enforcement Administration agents opened some of the closed bales for sampling purposes. *Id.* This court held that the plain view of the marijuana bulging from the bales that were split, in combination with the virtually identical appearances of the other closed bales and the presence of marijuana residue on the top of some of the bales "allowed the authorities to infer under ... the plain view exception that the bales not split open also contained marijuana." *Id.* at 507.

material inside, it was reasonable to assume each package weighed approximately one kilogram. Detective Finkel testified at Williams' suppression hearing that similarly wrapped packages, in his experience, "*always*" contained narcotics. (J.A. 61).

In addition to the fact that the five packages closely resembled packages containing cocaine regularly seized by law enforcement, the contents of the suitcase also spoke volumes. Besides the five packages, the suitcase contained two dirty blankets, eight towels, and one shirt with a cigarette burn. Besides the shirt, the suitcase contained no items which a person typically carries in his or her suitcase when traveling, such as clothes, shoes, or toiletry items. Logic dictates that Williams included the towels and dirty blankets so the five packages of cocaine would not float loose in the suitcase while being transported by airline personnel. Detective Finkel testified that given the packaging of the cocaine, and the fact that the suitcase only contained towels, dirty blankets, and one shirt, he had "no doubt at all" that the packages contained narcotics. Given the fact that Detective Finkel is a ten-year veteran of narcotics enforcement, this is a compelling factor pointing toward the conclusion that the contents of the packages were a foregone conclusion. Furthermore, Lee testified that "the bags looked like dope." (J.A. 38). The other "very unusual" contents of the luggage (referring to the towels and dirty blankets) added to her "suspicions." (J.A. 44–45). Because Lee is a layperson, not trained in law enforcement, her belief that the five packages contained "dope" strongly supports the district court's conclusion that the contents of the packages were a foregone conclusion.[3]

In summary, we hold that given: (1) the manner in which the cocaine was packaged (apparently weighing approximately one kilogram each, heavily wrapped in cellophane with a brown opaque material inside); (2) Detective Finkel's firm belief, based on his ten years' experience, that packages appearing in this manner always contained narcotics; (3) Lee's belief that the packages contained narcotics; and (4) that the only items found in Williams' suitcase besides the five packages of cocaine were towels, dirty blankets, and a shirt with a cigarette burn, the incriminating nature of the five packages found in Williams' suitcase was a foregone conclusion. In other words, when a person opens a Hershey bar, it is a foregone conclusion that there is chocolate inside. Here, when Detective Finkel's partner opened one of the packages, it was a foregone conclusion that narcotics were inside. Accordingly, Williams' expectation of privacy in those packages was unreasonable, and a search warrant was unnecessary. When a container has been legally seized, and its contents are a foregone conclusion, we hold that a subsequent search of the container is lawful under the plain view container doctrine.

### III.

■ Next, Williams contends that probable cause did not exist for his arrest, and therefore the district court erred in admitting his postarrest statements because they were tainted fruit of the poisoned tree. *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). This contention is without merit.

■ Police officers may arrest a suspect without a warrant as long as they act on the basis of probable cause. *See United States v. Williams*, 10 F.3d 1070, 1074 (4th

---

**3.** Williams relies on *United States v. Miller*, 769 F.2d 554 (9th Cir.1985), for the proposition that the officers needed to obtain a search warrant in order to search the five packages that he conceded had been lawfully seized. We find *Miller* unpersuasive. In *Miller*, the government searched a hard, fiberglass container surrounded by white powder held by a clear plastic bag and partially wrapped in masking tape. *Id.* at 555. The plastic bag had fallen out of Miller's suitcase while being handled by airline baggage workers. Concluding that the contents of the fiberglass container were not in plain view, the Ninth Circuit Court of Appeals held that the search was illegal. *Id.* at 560. We do not find *Miller* persuasive because the government searched the fiberglass container after a negative field test on the white powder surrounding it. *Id.* This fact would tend to prevent the incriminating nature of the fiberglass container's contents (cocaine) from being a foregone conclusion. Furthermore, *Miller* does not contain any facts that suggest that Miller's suitcase only contained *unusual* items as in the instant case.

Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994). Probable cause consists of " 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " *Id.* at 1073–74 (quoting *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979)). In this case, the following evidence existed regarding probable cause for Williams' arrest: (1) Williams' display of the claim tag for the suitcase containing the five packages of cocaine to an America West employee at the ticket counter while stating: "I called, and they said *my bag* was here" (J.A. 284); (2) his exercising control over the same suitcase by retrieving it from the America West baggage carousel and proceeding to leave the airport; and (3) thirty minutes prior to Williams' presentation of the baggage claim check at the America West ticket counter, a person with a very similar name (*i.e.,* Wilson) described an identical suitcase and recited a claim check number matching the number of the suitcase containing the five packages of cocaine. Clearly, this evidence would lead " 'a prudent person, or one of reasonable caution, [to] believ[e], in the circumstances shown, that [Williams had] committed, [was] committing, or [was] about to commit an offense.' " *Williams,* 10 F.3d at 1073–74 (quoting *DeFillippo,* 443 U.S. at 37, 99 S.Ct. at 2632). Accordingly, the district court properly admitted Williams' postarrest statements.

### IV.

■■■ Williams also contends the evidence was insufficient to sustain his conviction, but this contention is without merit. In assessing the sufficiency of the evidence, we must review the evidence and determine if there is "substantial evidence, taking the view most favorable to the government, to support [the jury verdict]." *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The jury convicted Williams of possession of cocaine with intent to distribute in violation of 21 U.S.C.A. § 841(a)(1) (West 1981). This offense re-

quires proof beyond a reasonable doubt that Williams knowingly and intentionally possessed the cocaine contained in his suitcase with the intent to distribute it. *See United States v. Roberts,* 881 F.2d 95, 98 (4th Cir. 1989).

Williams only disputes the sufficiency of the evidence as to his knowledge that the suitcase contained cocaine. We incorporate here the evidence discussed in Part I of this opinion, and hold that it unquestionably supports the jury's finding beyond a reasonable doubt that Williams knew the suitcase contained cocaine when he took it off the America West baggage carousel.

### V.

■■■ Finally, Williams contends that the district court erred in admitting Detective Curley's statement that he called the Crystal City Holiday Inn and found out "there was no Mr. Wilson in room 412," (J.A. 247) because it was hearsay. While we agree that the district court erred in admitting this statement, its error was clearly harmless. Hearsay is inadmissible unless it falls within one of the exceptions provided in the Federal Rules of Evidence. Fed.R.Evid. 802. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted. *See* Fed. R.Evid. 801(c). In this case, the desk clerk at the hotel was the declarant; he was out of court at the time of his statement to Detective Curley that "there was no Mr. Wilson in room 412" (J.A. 247); and the government used the declarant's statement as evidence of the truth of the matter asserted—"there was no Mr. Wilson in room 412." *Id.* Therefore, the statement was hearsay, and inadmissible because it did not fall within one of the hearsay exceptions. Fed.R.Evid. 801(c).

Although the district court erred in admitting this hearsay statement, the error was harmless. "[I]n the realm of nonconstitutional error, the appropriate test of harmlessness ... is whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not sub-

**200**

stantially swayed by the error." *United States v. Sanders*, 964 F.2d 295, 299 (4th Cir.1992) (internal quotations omitted). The outcome of a harmless error analysis is fact-specific. *United States v. Grooms*, 2 F.3d 85, 89 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1550, 128 L.Ed.2d 199 (1994). Although this statement was improperly admitted, and the government did briefly mention the false room number in its closing argument on the issue of Williams' knowledge of the suitcase's contents, we conclude that in light of the overwhelming evidence of guilt in this case and the minor nature of the error at issue, the judgment was not swayed by the admission of the hearsay statement. *See Sanders*, 964 F.2d at 299.

### VI.

For the reasons stated herein, the judgment of the district court is affirmed.

*AFFIRMED.*